# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BANKUNITED, N.A. and<br>BANKUNITED, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 2025-0956-BWD |
| | ) | |
| BRETT SHULICK, MAGDALENA GROCHOLA, ANTHONY KURCHE, KYLE HARRIS, BRENDAN ROONEY, and CUSTOMERS BANK, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER DENYING MOTION TO EXTEND DEADLINE AND APPLICATION FOR CERTIFICATION OF INTERLOCUTORY APPEAL

**WHEREAS:**

A.      Plaintiffs BankUnited, Inc. and BankUnited N.A. ("BankUnited," and with BankUnited, Inc., "Plaintiffs") have applied for certification of interlocutory appeal (the "Application") of this Court's January 2, 2026 Memorandum Opinion Denying Motion for Preliminary Injunction (the "Memorandum Opinion").  Appl. for Certification of Interlocutory Appeal [hereinafter Appl.], Dkt. 145.  Because the Application was untimely, Plaintiffs also have moved for a retroactive enlargement of the filing deadline for the already-filed Application (the "Motion").  Pls.' Mot. Under Del. Ct. Ch. R. 6(b) to Extend Deadline to File Appl. for Certification of Interlocutory Appeal [hereinafter Mot.], Dkt. 147.

B.    On January 2, 2026, following a two-day evidentiary hearing, the Court issued the Memorandum Opinion, denying a motion to preliminarily enjoin former employees and a competitor from soliciting Plaintiffs' employees and customers. *BankUnited, N.A. v. Shulick*, 2026 WL 21637 (Del. Ch. Jan. 2, 2026) [hereinafter Mem. Op.].    As detailed in the Memorandum Opinion, BankUnited, Inc. is a Delaware corporation and holding company for BankUnited, a national bank headquartered in Florida that provides consumer and commercial banking products and services. *Id.* at *1.  BankUnited's National Title Solutions ("NTS") division provides banking and treasury management solutions to clients in the title industry. *Id.*

C.    Defendant Brett Shulick led the NTS division as Executive Vice President and Managing Director from 2023 until August 15, 2025. *Id.*  As of August 2025, three NTS Senior Vice Presidents reported directly to Shulick: Director of Partnerships, Magdalena Grochola; Director of Sales, Anthony Kurche; and Director of Banking, Kyle Harris. *Id.*  In total, twenty-three employees reported to Grochola, Kurche, or Harris, including Brendan Rooney (with Shulick, Grochola, Kurche, and Harris, the "Individual Defendants"). *Id.*

D.    In the summer of 2025, Shulick, Grochola, Kurche, and Harris decided to look for other employment. *Id.*  In August, Shulick, Grochola, Kurche, and Harris made a collective decision to leave BankUnited to grow a title solutions business

2

within Customers Bank, a "branch-light" institution that describes itself as "a corporate bank for corporations." *Id.* at *2–3. Immediately following the Individual Defendants' resignations from BankUnited, Customers Bank called fourteen employees in BankUnited's NTS division (and one additional BankUnited employee) and offered them employment with Customers Bank. *Id.* at *3. By the end of the weekend, eleven BankUnited employees accepted employment with Customers Bank. *Id.*

E.  BankUnited contends that the Individual Defendants then began aggressively soliciting BankUnited's clients and customers. *Id.* While the Individual Defendants deny engaging in improper solicitation, they admit to contacting BankUnited customers between August 15 and August 22 to inform them of their departure. *Id.*

F.  On August 22, BankUnited sent letters (the "Cease-and-Desist Letters") to Customers Bank and the Individual Defendants, alleging that the Individual Defendants had violated non-solicitation obligations in BankUnited's Code of Conduct and certain Restricted Stock Unit ("RSU") and Restricted Stock Award ("RSA") agreements (collectively, the "Award Agreements"), and had misappropriated BankUnited's confidential information and trade secrets. *Id.* at *4. Prior to receiving the Cease-and-Desist Letters, the Individual Defendants were not aware of the Award Agreements and did not provide copies to either Customers

3

Bank or their own counsel. *Id.* After the Cease-and-Desist Letters identified the Award Agreements, the Individual Defendants were able to locate copies through an online benefits portal maintained by Merrill Lynch. *Id.*

G. After receiving the Cease-and-Desist Letters, Customers Bank instructed its title solutions team to go "pencils down" and cease all client outreach pending further investigation. *Id.* at *5.

H. On August 25, Plaintiffs initiated this action through the filing of a Verified Complaint (the "Complaint"). *Id.* Plaintiffs moved for expedited proceedings and a temporary restraining order. *Id.* At a September 5 hearing, the Court ordered expedition in advance of Plaintiffs' forthcoming motion for preliminary injunction and granted the request for a temporary restraining order, directing the parties to meet and confer on a form of order. *Id.* On September 26, the Court entered Defendants' proposed form of temporary restraining order (the "TRO"), temporarily enjoining Customers Bank and the Individual Defendants from (1) using or disclosing Plaintiffs' confidential information or documents; (2) soliciting BankUnited employees; or (3) using the Individual Defendants to solicit any "Prohibited [BankUnited] Customer" identified on a prohibited customer list. *Id.* The list that BankUnited ultimately provided included approximately 4,500 entries. *Id.* The Court set a bond in the amount of $1.5 million. *Id.*

4

I.     The parties completed briefing on Plaintiffs' motion for preliminary injunction on December 12.  *Id.*  Ten witnesses testified at a two-day evidentiary hearing on December 16 and 17.  *Id.*  The parties submitted additional testimony by deposition on December 19.  *Id.*  On January 2, 2026, the Court issued the Memorandum Opinion.

J.     As the Memorandum Opinion explained, BankUnited's request for relief against the Individual Defendants was premised on alternative claims for breach of contract and breach of fiduciary duty, while BankUnited's request for relief against Customers Bank was premised on alternative claims for tortious interference with contract and aiding and abetting breach of fiduciary duty.  *Id.* at *6. The Memorandum Opinion concluded that BankUnited failed to demonstrate that it was likely to prevail on any of those claims.  *Id.*

K.     The Court found that BankUnited did not demonstrate that it was likely to succeed on the merits of its breach of contract claim against the Individual Defendants.  *Id.*  BankUnited sought to enforce non-solicitation obligations in BankUnited's Code of Conduct and the Award Agreements.  *Id.*  First, the Memorandum Opinion concluded that BankUnited's Code of Conduct did not create enforceable obligations.  *Id.*  Second, the Memorandum Opinion found that although Plaintiffs were likely to succeed on an argument that the Individual Defendants assented to the Award Agreements by "accepting" them through the Merrill Lynch

5

online portal, the non-solicitation provisions in the Award Agreements were overbroad and unenforceable, and the factual record did not support blue penciling the Award Agreements. *Id.* at *7–10.

L.      The Court also found that BankUnited failed to demonstrate that it was likely to succeed on the merits of its claim for breach of fiduciary duty against the Individual Defendants, or on its claims against Customers Bank, which were predicated on unavailing claims against the Individual Defendants. *Id.* at *10–12.

M.      Plaintiffs filed the Application on January 16, 2026, fourteen calendar days after the Memorandum Opinion was issued. Appl., Dkt. 145. On January 23, Plaintiffs filed the Motion, seeking to extend the deadline for the already-filed Application. Mot., Dkt. 147. Defendants opposed the Application and the Motion on January 26. Defs. Combined Opp'n to Pls.' Appl. for Certification of Interlocutory Appeal and Mot. to Extend Deadline, Dkt. 148.

NOW, THEREFORE, IT IS HEREBY ORDERED, this 2nd day of February 2026, as follows:

1.      The Application should be denied because it is untimely. Supreme Court Rule 42(c)(i) requires that an application for certification of an interlocutory appeal "shall be served and filed within 10 days of the entry of the order from which the appeal is sought or such longer time as the trial court, in its discretion, may order for good cause shown." Supr. Ct. R. 42(c)(i). The Memorandum Opinion was issued

6

on January 2. The Application was filed fourteen days later, on January 16. In the Motion, Plaintiffs contend that they "filed the Application four days late because of an honest, good faith mistake" when calculating the filing deadline. Mot. ¶¶ 1–2 (explaining that counsel failed to include weekends when calculating the ten-day period under Supreme Court Rule 42). A mistake in miscalculating the deadline, even if made in good faith, does not constitute good cause for an extension of time. *See Lampert v. Cannon Square, LLC*, 340 A.3d 1151 (Del. 2025) (TABLE) (refusing interlocutory appeal where the defendant-appellants "failed to demonstrate good cause to excuse their untimely filing"); *In re Sears Hometown and Outlet Stores, Inc. S'Holder Litig.*, 2025 WL 882587, at *4 (Del. Ch. Mar. 21, 2025) (explaining that an error "calculating time under Chancery Court Rule 6 rather than Supreme Court Rule 11" did not support "a finding of good cause"); *see also, e.g.*, *Envirokare Composite Corp. ex rel. LRM Indus. Int'l, Inc. v. D&D Mfg., LLC*, 2024 WL 1528695, at *1 n.8 (Del. Ch. Apr. 9, 2024) (explaining that "not read[ing] the last sentence of Supreme Court Rule 42(a) or misconstru[ing] it" "is not 'good cause' under Rule 42 nor a good reason to extend the deadline"). The Motion is DENIED and the Application remains untimely.

2. Even if the Application were timely, however, the Court would deny it on the merits. Supreme Court Rule 42 governs applications for interlocutory appeals, cautioning that "[i]nterlocutory appeals should be exceptional, not routine,

7

because they disrupt the normal procession of litigation, cause delay, and can threaten to exhaust scarce party and judicial resources." Supr. Ct. R. 42(b)(ii). "Applications for interlocutory review are addressed to the sound discretion of this Court and are accepted only in extraordinary circumstances." *Robino-Bay Ct. Plaza, LLC v. W. Willow-Bay Ct., LLC*, 941 A.2d 1019 (Del. 2007) (TABLE).[1]

3.      Supreme Court Rule 42 establishes a two-step test for deciding whether to certify interlocutory appeal. Supr. Ct. R. 42(b). The Court must first determine whether "the order of the trial court decides a substantial issue of material importance that merits appellate review before a final judgment." *Id.* 42(b)(i). If that requirement is met, the Court will analyze eight factors to assess whether "there are substantial benefits that will outweigh the certain costs that accompany an interlocutory appeal." *Id.* 42(b)(ii).

4.      The substantial-issue requirement is met when a ruling "decides a main question of law which relates to the merits of the case, and not to collateral matters." *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2861717, at *1 (Del. Ch. July 22, 2008). Plaintiffs argue that the Memorandum Opinion decided a substantial issue by "h[o]ld[ing] that the Non-Solicitation Provisions in the Award Agreements likely are overbroad and unenforceable and declin[ing] to blue pencil the Provisions."

---

[1] Though this decision referred to the Supreme Court in its use of "this Court," trial courts exercise that same discretion in recommending whether interlocutory appeals should be certified.

Appl. ¶ 17. This Court has previously concluded that the enforceability of a restrictive covenant and suitability of blue penciling raises a substantial issue. *Hub Gp., Inc. v. Knoll*, 2024 WL 3950683, at *3 (Del. Ch. Aug. 27, 2024).

5.     The Application nevertheless fails because the costs of interlocutory appeal outweigh any benefits. Supreme Court Rule 42 identifies eight factors to consider when balancing the costs and benefits of an interlocutory appeal. *See* Supr. Ct. R. 42(b)(iii)(A)–(H). Plaintiffs argue that two factors support certification of an interlocutory appeal here.

6.     Primarily, Plaintiffs contend that "decisions of the trial courts are conflicting upon [a] question of law."[2] Appl. ¶ 13 (citing Supr. Ct. R. 42(b)(iii)(B)).

a.     First, the Memorandum Opinion determined that the Customer Non-Solicitation Provision "is vastly overbroad and not tailored to protect BankUnited's legitimate interests for at least three reasons."[3] Mem. Op. at *8.

---

[2] In actuality, most of Plaintiffs' arguments are based not on a conflict among trial court rulings, but on purported conflicts between the Memorandum Opinion and prior decisions issued by this Court. *See, e.g.*, Appl. ¶ 22 ("In other decisions, trial courts upheld non-solicitation agreements . . . ."); *id.* ¶ 31 ("Given that the [Memorandum Opinion] conflicts with other trial court rulings on these issues, an appeal is needed to clarify the bounds of Delaware law on these commercially important matters."). Arguments that the Memorandum Opinion misapplied existing law do not support interlocutory review.

[3] Plaintiffs note that when the TRO was entered, the Court did not "rais[e] any concerns regarding the breadth of the Non-Solicitation Provisions." Appl. ¶ 10. The Court decides issues that are fairly presented to it; it does not prejudge facts without a record or raise legal issues *sua sponte*, particularly when litigants are represented by capable counsel. At the TRO stage, Defendants did not argue the overbreadth of the restrictive covenants, nor

9

Plaintiffs take issue with two of those reasons—that "the overbreadth of the Customer Non-Solicitation Provision is compounded by the fact that it applies not only to current, but also 'prospective,' customers and clients," and "the Customer Non-Solicitation Provision purports to prohibit a restricted party from even '*attempt*[*ing*] to . . . contact or call upon[] any clients or customers[] of [BankUnited].'" *Id.* at *9. Plaintiffs contend that, in this regard, the Memorandum Opinion conflicts with prior decisions that "upheld non-solicitation agreements that included prospective customers"[4] or that "contain[ed] the word 'attempt.'"[5] Appl. ¶¶ 22–23. But this argument elides the *primary* basis on which the Court found the Customer Non-Solicitation Provision unenforceable:

> [T]he Customer Non-Solicitation Provision broadly purports to prohibit a restricted party from contacting any BankUnited client or customer about whom the restricted party "received information" during the two-

---

would they have been likely to succeed at that stage given the low colorability standard. Defendants were nevertheless permitted to raise overbreadth arguments at the preliminary injunction stage, and the Court decided the arguments when they were presented.

[4] *See id.* ¶ 22 ("In other decisions, trial courts upheld non-solicitation agreements that included prospective customers." (citing *Gener8 LLC v. Castanon*, 2023 WL 6381635 (Del. Ch. Sept. 29, 2023))). In *Gener8 LLC v. Castanon*, the defendant "d[id] not challenge the enforceability of the restrictive covenant or the reasonableness of its scope." 2023 WL 6381635, at *19.

[5] *See* Appl. ¶ 23 ("Other recent decisions by the Court of Chancery have enforced non-solicitation agreements that similarly contain the word 'attempt.'" (citing *Cleveland Integrity Services, LLC v. Byers*, 2025 WL 658369 (Del. Ch. Feb. 28, 2025))). *Cleveland Integrity* afforded the restrictive covenants at issue "the additional latitude afforded in the context of a sale of a business," not applicable here. 2025 WL 658369, at *10. And while *Cleveland Integrity* enforced a provision that covered "attempts" to solicit, it also emphasized that "Delaware courts evaluate restrictive covenants 'holistically and in context.'" *Id.* at *8.

year period prior to the restricted party's departure. The Customer Non-Solicitation Provision is not limited to customers about whom a restricted party received *confidential* information, nor is it further limited to include only those customers with whom the restricted party interacted during his or her employment with BankUnited.

In practice, while employed by BankUnited, the Individual Defendants received daily emails attaching basic customer and client information, including a PRC Report that included more than 4,500 entries. BankUnited has taken the untenable position that the Customer Non-Solicitation Provision applies to every one of the customers identified on that list—around 1,200 "households" when affiliated entities are grouped together. Although an "employer has an interest in the goodwill created by its sales representatives and other employees," BankUnited does not have a legitimate interest in prohibiting any single employee from soliciting thousands of businesses as clients, including many clients with which the employee never came into contact.

The record developed at the preliminary injunction hearing highlights the unreasonableness of a Non-Solicitation Provision that covers more than a thousand customers and clients. The Individual Defendants have not memorized the 1,200 customers purportedly subject to the Customer Non-Solicitation Provision, nor could any person reasonably be expected to do so. As a result, to ensure compliance with the Customer Non-Solicitation Provision (and TRO) during the pendency of this litigation, Customers Bank was forced to implement a multi-step process in which each employee within its title division had to obtain sign-off from multiple levels of supervisors confirming that a client contact did not appear on BankUnited's restricted list before the employee could do his or her job. In addition, to avoid breaching the Customer Non-Solicitation Provision, the Individual Defendants avoided social media outreach and networking events, for fear that they might inadvertently "solicit" one of the hundreds of customers purportedly covered by the Customer Non-Solicitation Provision.

Mem. Op. at *8. That fact-driven analysis, reached after a two-day evidentiary hearing at which ten witnesses testified and hundreds of documentary exhibits were introduced, does not conflict with prior rulings of this Court.

b. Second, the Memorandum Opinion determined that the Employee Non-Solicitation Provision "is fatally overbroad," relying on a recent decision, *HKA Global, LLC v. Beirise*, 2025 WL 3639811 (Del. Ch. Dec. 16, 2025),[6] which held that "a ban on 'encouraging' employees to leave is unenforceably overbroad because it captures non-competitive conduct." Mem. Op. at *9 (quoting *HKA*, 2025 WL 3639811, at *6). Plaintiffs argue that *HKA* conflicts with another prior decision, *Cleveland Integrity*, upholding a non-solicitation provision that included similar language.[7] *HKA* and *Cleveland Integrity* do not conflict. The defendant in *Cleveland Integrity* did not argue that the use of "encourage" rendered

---

[6] Plaintiffs claim they "lacked a meaningful opportunity to rebut Defendants' reliance on *HKA*" because that decision was not issued until the first day of the preliminary injunction hearing in this case. Appl. ¶ 25. Plaintiffs had ample opportunity to submit a response to *HKA* but chose not to do so. The Memorandum Opinion was issued sixteen days after the preliminary injunction hearing concluded.

[7] *See* Appl. ¶ 26 ("Both the [Memorandum Opinion] and *HKA* appear in conflict with *Cleveland Integrity*, where the Court of Chancery upheld a non-solicitation agreement that similarly prohibited former employees from encouraging individuals to leave the employer.").

the non-solicitation provision overbroad, and the Court did not take up an issue not fairly presented.[8]

      c.     Third, Plaintiffs claim that the Court's discretionary determination not to blue pencil the Award Agreements conflicts with the Delaware Supreme Court's decision in *Sunder Energy, LLC v. Jackson* (*Sunder II*), 332 A.3d 472 (Del. 2024). It plainly does not—the Memorandum Opinion relied on and quoted *Sunder II* extensively. *See* Mem. Op. at *9 (following *Sunder II*, 332 A.3d at 486, 490). Plaintiffs further argue that "[t]he Court's refusal to blue pencil . . . was based on seemingly inconsistent factual findings" when it explained:

> Although I concluded above that BankUnited is likely to succeed in proving that the Individual Defendants *assented to the Award Agreements* through the Merrill Lynch online benefits portal, the circumstances under which the Individual Defendants entered into the Award Agreements demonstrate that blue penciling is inappropriate. *The Individual Defendants did not know that the Award Agreements existed.* The facts here offer a dramatic contrast to cases evincing equal bargaining power and opportunity for negotiation in which this Court has considered blue penciling.

Appl. ¶ 32; Mem. Op. at *10 (emphasis added). Plaintiffs point out that if the Individual Defendants assented to the Award Agreements, they must have known the agreements existed. Admittedly, the Memorandum Opinion could have been

---

[8] *HKA*, consistent with *Sunder Energy, LLC v. Jackson* (*Sunder I*), 305 A.3d 723 (Del. Ch. 2023), *aff'd in part, rev'd in part on other grounds*, 332 A.3d 472 (Del. 2024), held that it would be unreasonable to prohibit a restricted party from "discuss[ing] whether joining a non-profit would be more personally rewarding and aligned with that person's values." 2025 WL 3639811, at *6.

more precise. The circumstances under which the Individual Defendants accepted the Award Agreements, including the fact that the Individual Defendants did not *recall* indicating their acceptance to dense contracts through an online portal, suggest an inequality of bargaining power and lack of opportunity for negotiation that undermines Plaintiffs' request for blue penciling. This conclusion is consistent with *Sunder II* and many other decisions. *See Sunder II*, 332 A.3d at 486 ("Delaware courts have exercised their discretion to blue pencil restrictive covenants under circumstances that indicate an equality of bargaining power between the parties, such as where the language of the covenants was specifically negotiated, valuable consideration was exchanged for the restriction, or in the context of the sale of a business."); *see also, e.g.*, *Payscale Inc. v. Norman*, 2025 WL 1622341, at *7 (Del. Ch. June 9, 2025) (declining to blue pencil where "the Amended Complaint [failed to] allege facts suggesting that the parties enjoyed equal bargaining power, or even that the Restrictive Covenants were negotiated"); *Weil Holdings II, LLC v. Alexander*, 2025 WL 689191, at *7 (Del. Ch. Mar. 4, 2025) (finding "the undisputed facts 'd[id] not carry any of th[e] hallmarks' of equal bargaining power which might support blue penciling the parties' agreement"), *aff'd*, 2025 WL 2993362 (Del. Oct. 23, 2025) (TABLE).

     d.    For these reasons, Plaintiffs fail to identify any decisions conflicting upon a question of law that would support interlocutory review.

7.      Plaintiffs next argue that "[r]eview of the interlocutory order may serve considerations of justice." Appl. ¶ 13 (quoting Supr. Ct. R. 42(b)(iii)(H)). Plaintiffs' only basis for this argument is that "[i]nterlocutory review could substantially reduce further litigation by allowing the parties to obtain clarity with respect to their rights and obligations under Delaware law." Appl. ¶ 40. Even if an interlocutory appeal had the potential to reduce some litigation, it could not end the case, as the Memorandum Opinion's rulings were based on a preliminary record. *See Hub Gp.*, 2024 WL 3950683, at *3 ("[A]s the Court discussed in *Sunder* [*II*], even if the Delaware Supreme Court were to reverse the preliminary injunction decision and uphold the [restrictive covenant], additional issues regarding the issuance of a permanent injunction, balancing the hardships, causation, and damages remain."). Thus, this factor does not weigh strongly, if at all, in favor of an interlocutory appeal.

8.      No other factors under Supreme Court Rule 42 support certifying an interlocutory appeal. The Memorandum Opinion does not involve a novel question of law; the issues do not relate to the constitutionality, construction, or application of a statute; the ruling does not concern the controverted jurisdiction of the Court of Chancery; the Memorandum Opinion did not reverse or set aside a prior decision; it did not vacate or open a judgment; and, again, review will not terminate the litigation. *See* Supr. Ct. R. 42(b)(iii)(A), (C)–(G). I therefore conclude that the

likely benefits of interlocutory review do not outweigh the probable costs, such that interlocutory review is not in the interests of justice.

9.     For the foregoing reasons, the Application is DENIED.

*/s/ Bonnie W. David*

Bonnie W. David
Vice Chancellor